IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CARLOS HOSEA,

        Plaintiff,

v.                                                                                                                  CV 13-1189 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Carlos Hosea applied for Disability Insurance Benefits and Supplemental Security Income on August 31, 2010, based on fibromyalgia and sleep apnea. (Administrative Record ("AR") 69.) After his application was denied at all administrative levels, he brought this proceeding for judicial review. The case is before me now on Hosea's Motion and Memorandum to Reverse or Remand Agency's Decision, the Commissioner of the Social Security Administration's ("SSA") response, and Hosea's reply. (Docs. 22-24.) For the reasons explained below, I grant Hosea's motion and remand this case to the SSA for proceedings consistent with this opinion.

**STANDARD OF REVIEW**

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall*

*v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). The Court may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that she has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ determines the claimant's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e), 416.920(e). At the fourth step, the ALJ compares the claimant's RFC with the functional requirements of his past relevant work to see if the claimant is still capable of performing his past work. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing his past work, then he is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the

Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to his past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Hosea is a thirty-three-year-old man with a high-school education. (AR 168.) For the last fifteen years, he has worked mostly as a cook and a dishwasher, but he did some construction work in 2000. (AR 174-78.) According to a Disability Report, he stopped working on January 1, 2010, because his conditions caused too much pain in his hands and hips. (AR 167.)

The first record in the AR dates to January 12, 2004. (AR 335.) Hosea had his gallbladder removed with minimal complications. (*Id.*)

The next record is from December 2, 2009. (AR 235.) Matthew Patton, M.D., saw Hosea for bilateral hand problems and diagnosed him with a right dorsal wrist ganglion cyst and bilateral hand pain, possibly carpal tunnel syndrome. (AR 235.) Hosea told Dr. Patton that the pain in his wrist began a month before the appointment, but the pain in his hands had persisted for several years. (*Id.*) Hosea reported that he wakes up with numbness and tingling in his hands. (*Id.*) Upon reviewing x-rays of both wrists, Dr. Patton found no fractures, dislocations, or significant arthritic changes. (*Id.*)

Dr. Patton suggested nerve studies to evaluate possible carpal tunnel syndrome. (AR 236.) Nerve studies were negative for any type of peripheral compressive neuropathy, and

Hosea's lab results were normal. (AR 230.) Hosea was able to make a full fist. (*Id.*) Dr. Patton recommended that he schedule an appointment at the Arthritis Clinic. (*Id.*)

A Medical Diagnosis sheet from Presbyterian Medical Group dated August 31, 2010, indicates that Hosea was diagnosed with fibromyalgia, joint pain, and a sleep disorder. (AR 244.) Andres Peisajovich, M.D., with the rheumatology group at Presbyterian, wrote in a Consultation Note that Hosea said that his musculoskeletal pain started around 1998. (AR 253.) Dr. Peisajovich indicated that Hosea had a positive test for fibromyalgia. (AR 254.) On September 14, 2010, Dr. Peisajovich wrote that Hosea's symptoms were compatible with fibromyalgia and a sleep disorder. (AR 251.) Dr. Peisajovich noted that Hosea's physical exam was not completely positive for fibromyalgia, but he did have tender spots. (AR 252.) Dr. Peisajovich further indicated that Hosea should be seen for a sleep study, and that if he was diagnosed with sleep apnea, that problem should be treated first as it may relieve some of his other pain. (*Id.*)

Hosea filled out a Function Report on September 29, 2010. (AR 184.) He reported that he lives in a house with his wife and children. (*Id.*) Hosea's daily routine included waking up, showering, taking his kids to school, going for a short walk, coming home, eating breakfast, watching his youngest child, sometimes picking the kids up from school, sometimes making dinner, getting the kids ready for bed, and going to bed. (*Id.*) He could feed the family dog with his wife's help, could no longer stand for more than an hour or two, could no longer grasp items or open jars, and had no problems with his personal care. (AR 184-85.) Hosea reported being in so much pain that it impacted his sleep. (AR 185.) Hosea wrote that he could prepare his own meals and did so approximately once a week, but that preparing a meal took about forty-five minutes. (AR 186.) He was able to do laundry, dishes, mopping, and mowing, when his pain was not severe. (*Id.*) Hosea could drive and go out alone. (AR 187.) Before the onset of his condition,

Hosea reported that his hobbies included hunting, fishing, and bike riding, but that he can no longer do these things because of the pain, particularly in his hands. (AR 188-89.) He wears braces on his hands and wrists at night or as needed that were prescribed in January 2010. (AR 190.) Megan Hosea ("M. Hosea"), Hosea's wife, filled a Third Party Function Report on the same day that concurred with Hosea's reports. (AR 193.)

Eileen Brady, M.D., a non-examining medical consultant for New Mexico Disability Determination Services, conducted a Physical RFC Assessment of Hosea on October 28, 2010. (AR 256.) Dr. Brady determined that Hosea could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours in an eight-hour workday, and push or pull without limitation. (AR 257.) Dr. Brady noted that Dr. Peisajovich did not provide a detailed tender point exam for fibromyalgia, and that Hosea's serologic workup was negative. (*Id.*) Dr. Brady determined that a light RFC was reasonable considering Hosea's possible diagnosis of fibromyalgia, and found no credibility issues. (AR 257-58.) Janice Kando, M.D., conducted a Case Analysis on November 29, 2010, and affirmed Dr. Brady's Physical RFC Assessment. (AR 266.)

Hosea's primary care doctor, Donald Pichler, M.D., wrote in a Progress Note on January 14, 2011, that Hosea was experiencing pain in both legs and that his left thigh felt tingly and numb. (AR 328.) Dr. Pichler described the veins in Hosea's legs as "bulging." (*Id.*)

Judith Gillum, CNP, at the Presbyterian Sleep Center, noted that Hosea suffered from obstructive sleep apnea. (AR 298.) As of January 18, 2011, this condition was significantly improved by compliant use of a C-PAP every night. (*Id.*)

Gregory Maroney, PA-C, reported on February 8, 2011, that Hosea used his C-PAP every night. (AR 270.) Hosea reported joint pain, joint swelling, headaches, difficulty with work,

fatigue, anxiety, and depression. (*Id.*) Hosea was taking ibuprofen for pain, but no other medications. (AR 271.) Maroney found that Hosea did not exhibit pain over the fibromyalgia spots, but did exhibit some tenderness at six out of eighteen spots. (*Id.*) Maroney indicated that Hosea's pain did not follow the normal pattern of a fibromyalgia patient. (*Id.*) He prescribed hydrocodone, desipramine, and gabapentin, and referred Hosea to a fibromyalgia support group. (*Id.*)

At a March 24, 2011, follow-up, Maroney noted that Hosea was not taking gabapentin nor attending the fibromyalgia group because he was busy taking care of his children during the day. (AR 315.) Hosea said that he did not want to take pain medication because he needed to be alert to take care of his daughter, who was diagnosed with multiple sclerosis. (*Id.*) Hosea reported sharp, burning pain in all of his muscles. (*Id.*)

Bilateral knee x-rays on November 28, 2011, showed miniscule osteophytes that may be reflective of underlying femoral acetabular impingement. (AR 293.)

Tamara Hudson, M.D., filled out a Fibromyalgia Medical Source Statement on February 6, 2012. (AR 274.) Dr. Hudson was Hosea's new primary care doctor and had seen him two times when she filled out the statement. (*Id.*) She indicated that Hosea meets the criteria for fibromyalgia, with the additional impairments of obesity and sleep apnea. (*Id.*) Dr. Hudson stated that Hosea can sit for twenty to thirty minutes, can stand for twenty to thirty minutes, can sit/stand/walk for less than two hours in an eight-hour workday, and needs to be able to shift positions at will. (AR 275.) Hosea must walk for approximately ten minutes every hour. (AR 276.) At work, he will need an assistive device and will need approximately five unscheduled breaks of roughly five to ten minutes. (*Id.*) Dr. Hudson indicated that Hosea could occasionally lift ten pounds and frequently lift less than ten pounds. (*Id.*) He would be off-task approximately

ten percent of the day. (AR 277.) Dr. Hudson stated that Hosea is capable of low-stress work and would be absent approximately one day a month because of pain. (*Id.*) He was taking hydrocodone, gabapentin, and Cymbalta for pain, and desipramine for sleep. (AR 278.)

Dr. Hudson updated her statement on March 30, 2012, to say that Hosea's pain limits his ability to sit or stand for more than an hour at a time, he cannot lift or do repetitive motions for more than an hour, and he experiences pain and limited mobility in his hands and wrists. (AR 353.)

### HEARING TESTIMONY

The ALJ held a hearing on May 17, 2012, at which Hosea, M. Hosea, and a Vocational Expert ("VE") testified. (AR 28-64.) Hosea was represented by an attorney. (*Id.*)

Hosea's attorney made an opening statement. (AR 31-32.) Then, Hosea testified. He worked as a cook until January 1, 2010, but stopped because he was in a lot of pain and his job required him to be on his feet for extended periods. (AR 33.) Hosea testified that his pain prevents him from working: he can neither stand nor sit for extended periods, and the pain is located in "[his] hips and [his] back and [his] knees and [his] toes and [his] wrists and [his] elbows, [his] fingers, everywhere." (AR 33.) Hosea said that stress exacerbates his pain, and provided driving and getting cut off as an example of a stressful situation. (AR 35.)

Hosea was taking hydrocodone and desipramine for pain. (AR 33.) He stopped taking Cymbalta because it was giving him severe panic attacks. (AR 34.) The hydrocodone makes Hosea "like a zombie, like not really worth anything." (*Id.*) Hosea walks with a cane. (AR 36.) The cane was not prescribed, but it helps with his pain, and his doctor said he could use one. (*Id.*)

Hosea clarified that he did not attend the fibromyalgia group meetings because he gets anxious when meeting new people. (AR 35.) He said that the group had moved and he has been

unable to find another group. (*Id.*) Hosea has not been to a counselor for anxiety, does not take any medication for anxiety, and has never been diagnosed with anxiety. (AR 35-36.)

Hosea testified that he lives with his wife and his children. (AR 36-37.) When M. Hosea is at work, the older kids are usually at school and M. Hosea's aunt usually watches the youngest child. (AR 37.) Hosea said that he has trouble bathing because he cannot bend down to wash his legs or his feet. (*Id.*) He can drive so long as he does not take hydrocodone, because it interferes with his concentration. (*Id.*) He does not cook, goes grocery shopping only with his wife, does laundry only if it is "in the bucket" and not on the floor, sweeps but does not vacuum, does not take out the trash, and only supervises when his brother does the yard work. (AR 38-39.) Before the onset of his symptoms, Hosea liked to go fishing and hunting, but he is no unable to do these things. (AR 39.) He goes to school activities for the kids "if possible," does not go to church, and does not belong to clubs or organizations. (*Id.*) On a typical day, Hosea testified that he wakes up around 6:00 a.m., takes the older kids to school, takes the youngest to M. Hosea's aunt's home, comes home, takes medicine, maybe does laundry or some tidying up, reads or watches TV, and sits in his recliner or lays down. (AR 39-40.) He no longer takes care of the children. (AR 46.) Hosea confirmed that doctors have advised him to lose weight, and he feels better when his diet is healthier. (AR 40.)

Hosea started working full-time at age fourteen, while working for a burger restaurant in high school. (AR 42.) He then worked full-time for Pizza Hut as a dishwasher and a pizza cook, until he moved to Santa Ana Star Casino to be a dishwasher. (*Id.*) He worked at the casino as a dishwasher for about ten years before becoming a cook for Sandia Casino. (AR 43.) He was diagnosed with fibromyalgia while working as a supervisor of the banquet cooks at Sandia Casino. (AR 43-44.) Hosea said that his pain has increased over the years. (AR 44.)

Hosea's attorney then reviewed Dr. Hudson's statement with him and had him confirm the physical limitations. (AR 44-46.) Hosea confirmed that he does not think that he can work. (AR 49.)

Hosea's attorney then questioned M. Hosea. M. Hosea confirmed that she has known Hosea for approximately fifteen years. (AR 51.) She testified that Hosea did not want to stop working: he has always worked full-time and enjoyed working. (AR 51-52.) M. Hosea stated that Hosea can no longer play with the kids, take care of the kids, do yard work, or pick anything up off the ground. (AR 52.) Hosea did not want to take medication, but his complaints of pain have increased, and he started taking pain medication. (AR 53.) M. Hosea indicated that Hosea's outlook on life seems to have changed and he "seems like more depressed now." (AR 55.)

The ALJ next questioned the VE. (AR 56-63.) The ALJ instructed the VE to testify based on jobs in Bernalillo, Sandoval, and Valencia Counties. (AR 57.) The ALJ then asked the VE to assume a person of Hosea's age, education, and work history, who is limited to light work; must be able to alternate between sitting and standing approximately hourly; can occasionally climb and balance; can stoop only to sit; can never kneel, crouch, or crawl; must avoid exposure to hazardous conditions, including unprotected heights and dangerous moving machinery; and can frequently but not constantly handle, finger and feel. (AR 58.) The VE testified that such a person could not perform Hosea's previous work. (*Id.*) However, such a person could work as a ticket taker. (AR 59.)

Hosea's attorney then questioned the VE. (AR 59.) Hosea's attorney asked whether a ticket taker would be required to sit or stand for more than two hours in an eight-hour workday. (AR 60.) The VE testified that the job would probably require sitting or standing for more than two hours, and a person prohibited from that would be unable to be a ticket taker. (*Id.*) Such a

person would not be allowed to take unscheduled breaks and would require using his hands and wrists. (AR 61.) Hosea's attorney then asked the VE if taking five breaks in an eight-hour day, instead of three breaks, would interfere with someone's ability to be a ticket taker. (AR 62.) The VE testified that it would, as this gets into accommodations. (*Id.*) Finally, Hosea's attorney asked the VE if such a person could be a ticket taker if he were unable to do any functioning with his hands for more than an hour. (AR 63.) The VE indicated that such a person could not be a ticket taker. (*Id.*) Further, such a person would not be allowed to lay down while working. (*Id.*)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Hosea's application for benefits according to the sequential evaluation process. (AR 13-21.) At the first step, the ALJ found that Hosea had not engaged in substantial gainful activity since January 1, 2010, the alleged onset date. (AR 15.) Then, at the second step, the ALJ concluded that Hosea suffers from the severe impairments of morbid obesity, fibromyalgia, and obstructive sleep apnea. (*Id.*) At step three, the ALJ found that Hosea's combination of severe impairments did not equal one of the listed impairments. (AR 16.) The ALJ relied on the opinions of non-examining state agency physicians for this determination, noting that the opinions were well-reasoned and supported by the evidence of record. (*Id.*) Furthermore, the ALJ included the effects of obesity within the RFC. (*Id.*)

The ALJ then determined Hosea's RFC, finding that Hosea could perform light work, except that he must change positions between sitting and standing approximately every hour; he can stoop, but only to sit; he cannot kneel, crawl, or crouch; he must avoid hazards; and he is able to frequently handle, finger, and feel. (AR 16-17.)

The ALJ summarized Hosea's testimony and the AR. She noted that Hosea testified that he takes care of his children and "goes grocery shopping with his spouse, he sweeps, vacuums,

does laundry and attends school activities with his children." (AR 17.) The ALJ further concluded that Hosea's medically determinable impairments could be expected to cause some of his symptoms, but that his statements are not credible to the extent that they are inconsistent with the RFC. (*Id.*) The ALJ stated that there is no evidence that Hosea had a sleep evaluation. (AR 18.) The ALJ indicated that she afforded "little weight" to Dr. Hudson's opinion because it conflicted with the state agency consultant's finding that Hosea can do the full range of light work and with Hosea's testimony that he can do household chores and care for his children. (*Id.*) She further stated that one would expect to see restrictions placed on Hosea by his treating doctor, but no such restrictions exist in the record. (AR 19.)

The ALJ concluded at step four that Hosea could not perform his past relevant work. (AR 19.) At step five, however, the ALJ found that, considering Hosea's age, education, work experience, and RFC, Hosea could perform the work of a ticket taker. (AR 20.) The ALJ relied on the VE's expert testimony to address the sit/stand option, which is not addressed in the Dictionary of Occupational Titles. (*Id.*) As the ALJ determined that Hosea could perform jobs existing in substantial numbers in the national and regional economies, the ALJ concluded that Hosea was not disabled. (AR 20.)

Hosea appealed the decision to the Appeals Council, but the Council found that Hosea's reasons for disagreeing with the hearing outcome did not justify a review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-5.)

## DISCUSSION

Hosea makes several arguments for reversing and remanding this case. I have reordered the arguments to accord with the five-step sequential evaluation process. Hosea first argues that the ALJ erred at step three by finding that his impairments do not meet or medically equal one of

the listed impairments. At the RFC stage, Hosea makes three contentions: First, he argues that the ALJ failed to properly evaluate Dr. Hudson's opinion as a treating source, in violation of 20 C.F.R. § 404.1527. Second, Hosea argues that the ALJ erred in her credibility analysis by misstating Hosea's hearing testimony. Third, Hosea claims that the ALJ erred in her overall RFC determination. Next, Hosea argues that the ALJ erred at step five by failing to utilize the entirety of the VE's testimony. Finally, Hosea argues generally that the decision is not supported by substantial evidence.

### I. Step Three Findings

Hosea argues that the ALJ erred in not finding disability at step three. Hosea does not identify which listing his impairments meet or medically equal. Fibromyalgia cannot meet a listing because it is not a listed impairment. Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869, at *6 (July 25, 2012).[1] Hosea does not bear the burden of specifically identifying a relevant listing. *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 n.3 (10th Cir. 2005); *see also Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119-20 (3d Cir. 2000) (finding that an ALJ's "conclusory statement" at step three is "beyond meaningful judicial review").

In *Clifton v. Chater*, the Tenth Circuit remanded a case for additional proceedings when the ALJ stated a summary conclusion that a claimant's impairments did not meet or equal a listed impairment, and the ALJ did not discuss the evidence, his reasoning, or even identify the relevant listing. 79 F.3d 1007, 1009 (10th Cir. 1996). Other courts have remanded to the ALJ with instructions to "identify[] the relevant listings . . . [and] set out . . . specific findings and . . . reasons for accepting or rejecting evidence regarding whether [the claimant's] impairments meet

---

[1] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sce'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference.)

or equal those listings." *Bolan v. Barnhart*, 212 F. Supp. 2d 1248, 1258 (D. Kan. 2002); *see also Malakowsky v. Barnhart*, 66 F. App'x 756, 757-58 (10th Cir. 2003) (unpublished).

Here, the ALJ recited the standard for evaluating medical opinions announced in SSR 96-6p, 1996 WL 374180 (July 2, 1996) and affirmed that she had considered obesity in accordance with SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). (AR 16.) Nowhere in the step-three analysis does the ALJ explain how or why she determined that Hosea's severe impairments did not medically equal one of the listings. When an ALJ does not provide any further explanation, the reviewing court is "left to speculate what specific evidence led the ALJ to [her conclusion]." *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). On remand, the ALJ is instructed to specify the listings she reviewed, the evidence she considered, and the reasons for her step-three determination. *See Malakowsky*, 66 F. App'x at 757.

## II.   RFC Findings

Hosea argues that the ALJ failed to give appropriate weight to Dr. Hudson's treating medical source statements, in contravention of SSR 96-5p, 1996 WL 374183 (July 2, 1996), and 20 C.F.R. § 404.1527(c)(2).[2] The ALJ gave "little weight" to Dr. Hudson's opinions, noting that the state agency consultant found Hosea limited to the full range of light work, which the ALJ determined was consistent with the treatment records and Hosea's testimony. (AR 18.)

With respect to treating physicians, an ALJ must complete a sequential two-step process for evaluating a medical opinion. *See Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must decide whether a treating doctor's opinion commands controlling weight. *Id.*

---

[2] In his brief, Hosea cites to 20 C.F.R. § 404.1527(d)(2) in making this argument. Section 404.1527(d)(2) states that the Commissioner considers medical source opinions on issues reserved to the Commissioner, but that the final decision rests with the Commissioner. I assume that Hosea meant to cite § 404.1527(c)(2), which explains how the ALJ is supposed to evaluate treating sources to determine if the opinion should be given controlling weight.

13

A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Id.* (citing *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)). If a treating doctor's opinion does not meet this standard, the opinion is still entitled to deference to some extent as determined under the second step of the process. SSR 96-2p, 1996 WL 371488, at *2. In this second step, the ALJ must determine the weight to accord the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. §§ 404.1527(c), 416.927(c). *Id.* at 1330-31 (quotation omitted).

The ALJ's discussion indicates that she found Dr. Hudson's opinions inconsistent with the medical records and Hosea's testimony. However, upon finding that Dr. Hudson's opinions were not entitled to controlling weight, the ALJ did not weigh her opinions using the factors provided in 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ's statement that the state agency opinion differed is, at best, a gloss on the fourth factor, dealing with consistency with the record. Because the ALJ failed to address the remaining five factors, I find that the ALJ committed legal error in determining the weight to assign to Dr. Hudson's opinions. On remand, the ALJ must properly evaluate Dr. Hudson's opinions and consider them when addressing step four of the sequential evaluation process.

In considering Dr. Hudson's opinions in conjunction with the entire record, the ALJ may not misrepresent Hosea's testimony at the hearing. (*See* AR 18.) While the ALJ presents Hosea's comments as being able to perform household chores and take care of his children, he actually testified that he is unable to do these things any longer. (AR 39-40, 46.)

Because I have found legal error at step three and in the treatment of medical opinions at the RFC stage of the sequential evaluation process, I do not address whether the ALJ erred in her credibility analysis or in her use of the VE testimony. Nor do I address whether the ALJ's decision is supported by substantial evidence.

## CONCLUSION

I find that the ALJ committed legal error at step three by failing to discuss and explain the evidence and listings she considered in determining that Hosea's impairments did not medically equal one of the listings. Further, I find that the ALJ erred at the RFC stage by failing to discuss the factors used to determine whether a treating source's opinion is entitled to controlling weight. On remand, the ALJ will address these issues. Additionally, the ALJ is prohibited from misrepresenting Hosea's testimony to support her findings. The motion is GRANTED, and the case is remanded to the SSA for further proceedings consistent with this opinion.

IT IS SO ORDERED.

_____
William P. Lynch
United States Magistrate Judge

15

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.